AO 106 (Rev. 01/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Silver/Black Apple iPhone (ATF #: 000004), and<br>Black TracFone (#000007); including any removable<br>storage media contained within the phones | ) <br> ) <br> ) Case No. 2:19mj693<br> ) <br> ) <br> ) |

FILED
RICHARD W. NAGEL
CLERK OF COURT

2019 SEP -9 PM 2:47

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
COLUMBUS

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Southern_____ District of _____Ohio_____ *(identify the person or describe property to be searched and give its location)*: Silver/Black Apple iPhone (ATF #: 000004), and Black TracFone (#000007); including any removable storage media , CURRENTLY LOCATED AT ATF COLUMBUS FIELD OFFICE

See Attachment A, incorporated herein.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ___21___ U.S.C. § _841(a) & 846_ , and the application is based on these facts:

See Affidavit in Support of Application, incorporated herein.

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Jason Burns, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9-9-19

_____
Judge's signature

City and state: Columbus, Ohio

Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jason Burns, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property described—an electronic Apple iPhone and TracFone—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in further detail in Attachment B.

I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been September 2005. I am a graduate of the ATF National Academy Special Agent Basic Training Program and the Federal Law Enforcement Training Center, Criminal Investigator Training Program. As a result of my training and experience as an ATF Special Agent, I am familiar with Federal criminal laws pertaining to narcotics violations. As a Special Agent, I am also authorized to carry firearms, execute warrants, make arrests for the offenses against the United States, and perform other such duties as authorized by law.

The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I did not, however withhold any information or evidence that would negate probable cause.

Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that Marlei MATTHEW, and others have committed the following violations of law: Title 21, United States Code, Section 841(a) and 846, that is, conspire with others to possess with the intent to distribute a controlled substance, specifically Heroin, a schedule 1 controlled substance. There is also probable cause to search the cellular telephone devices identified below for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

### IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

A. The properties to be searched are a black/silver Apple iPhone S, Model A1633 (Smart-phone), FCC ID: BCG-E2946A, ATF Property #: 000004 (hereinafter "Apple iPhone"); and a black TracFone Wireless, Inc., (alcatel), Model A405DL (Flip-phone), FCC ID: 2ACCJN023, ATF Property #: 000007 (hereinafter "TracFone"). These items are currently located at the ATF-Columbus I Field Office, 230 West Street, Suite 300, Columbus, OH 43215. As explained below, these items were seized on August 22, 2019, from MATTHEW, who was located in the residence located at 635 W. Main Street, Newark, OH.

B. The applied-for warrant would authorize the forensic examination of the Apple iPhone and the TracFone for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### Chronological Background Regarding Ongoing Narcotics Trafficking of Marlei MATTHEW.

1. Over the course of the summer of 2018, Investigators from Cambridge, OH Police Dept. (CPD) and the Guernsey County Sheriff's Office (GCSO) determined, based upon information received from a reliable confidential informant (CI #1) that Martae SIMPSON was selling illicit narcotics at 912 Garfield Ave., Cambridge, OH. SIMPSON is a previous ATF Defendant and was convicted of Title 18 USC 922(g)(1) – Felon in possession of a firearm in 2015 (Case #: 2:14cr153, Southern District of Ohio).

2. Detectives made a series of controlled narcotics buys with the CI from Martae SIMPSON over a period of several weeks. The investigation culminated with the CPD SWAT team executing a search warrant on SIMPSON's house during October of 2018.

3. SIMPSON contacted detectives in early November 2018 wishing to provide information about his narcotics operation in consideration for a sentencing reduction on his State pending case.

4. Detectives met with SIMPSON and he advised that the "New York" crew was currently back in Cambridge to fill the void that had been left when his Garfield Ave. residence was raided.

5. SIMPSON went on to say he had actually been selling narcotics for the "New York" crew. He provided the names of Rayshawn BUSH, Ali VAUGHN, and Marlei MATTHEW. SIMPSON stated they were operating from two (2) houses in the Cambridge, OH area. The first one is at the top of the hill on S. 8th St., and the other is at N. 8th St. SIMPSON was unsure of exact addresses.

6. On or about November 8, 2018, Detectives called SIMPSON to see if there was any updates as to the whereabouts of the "New York" Crew. SIMPSON stated Rayshawn BUSH was staying at the blue apartments on N. 6th St. in Cambridge, OH, between Wheeling Ave. and Steubenville Ave. Detectives were familiar with the building SIMPSON was referring to, and decided to conduct surveillance on the residence.

7. On or about November 12, 2018, Detectives observed a gold colored Dodge Caravan parked in front of the residence SIMPSON had described. The plate number was Ohio Temp. Tag: G577647, registered to Cinnamon BUSH, the wife of Rayshawn BUSH. At 13:55 hours, a Detective observed Rayshawn BUSH exit the residence, and get into the van at which time surveillance was discontinued.

8. On or about November 14, 2018, a Detective drove past the blue apartments on N. 6th St., and observed the gold colored Dodge Caravan, Ohio Temp. Tag: G577647, once again sitting out front at approximately 10:00 AM.

9. The same group of individuals known as the "New York" crew were the focus of an extensive joint Federal/State investigation in 2013 for suspected narcotics trafficking and firearms violations. During the course of this investigation, it was learned that Rayshawn BUSH was a major participant in the criminal organization, and was supplying drugs to Guernsey County, Ohio. Rayshawn BUSH, Ali VAUGHN, Marlei MATTHEW, and Martae SIMPSON were among Suspects/Defendants in the 2013 investigation.

10. On or about November 22, 2018, CPD Officers were dispatched to the Deer Creek Motel, 2321 Southgate Parkway, Cambridge, OH, in reference to a suspicious vehicle that was driving around the parking lot of the motel. A Deer Creek employee advised that the vehicle was a small, 4-door car, with tinted windows, now parked in front of room 319. Upon arrival, CPD officers located the vehicle, a small Nissan car bearing a Dealer plate number: 1535, parked in front of room 319. Officers also observed a gold Dodge minivan, Ohio Temp. Tag: G577647, registered to Cinnamon BUSH, also parked in front of room 319. At this time, officers made contact with a male identified as Rafael SANTIAGO, sitting outside of the room. SANTIAGO advised he was staying in room 319 with his friend. SANTIAGO was asked for his identification, which he advised, was inside the room. SANTIAGO knocked on the door to get his identification. Upon the door opening, Officers advised the two (2) observed males inside the room to step outside to speak with the officers. SANTIAGO provided a New York State Federal ID card, and advised he was originally from Puerto Rico. The other two males were identified as Marlei MATTHEW and LaShawn FURMAN. FURMAN provided officers with a New York State ID. MATTHEW advised officers they had just got into the room not 20 minutes prior to the officers arrival, and wanted to know what was going on. Officers advised MATTHEW hotel employees had called because they observed the silver Nissan driving repeatedly around the lot, and became suspicious.

11. On or about November 23, 2018, surveillance units observed SANTIAGO, FURMAN, and MATTHEW enter the gold Dodge van, license plate number G577647, depart the Deer Creek Motel and travel across the street and obtain a room at the Days Inn, 2328 Southgate Parkway, Cambridge, OH, where they stayed for approximately 15 or more days.

12. On or about this same date, GCSO Detectives contacted the management of the Deer Creek Motel inquiring if room 319 had been re-rented after the SANTIAGO group had checked out. Detectives were advised it had not been re-rented. Detectives then requested permission from the management of the Deer Creek Motel to run a narcotics alerting Canine in room 319 before it would be re-rented. Deer Creek Motel management consented to the request.

13. On or about November 24, 2018, a Cambridge PD Canine (K-9) specifically trained in alerting to the presence of narcotics was taken into Deer Creek Motel room 319 where he provided a Positive alert to the presence of narcotics.

14. On or about January 30, 2019, Marlei MATTHEW was accused of pistol-whipping a narcotics customer/victim in Cambridge, OH over an unpaid drug debt owed to MATTHEW. The victim stated "MATTHEW had a .380 (caliber) pistol that he smacked him with." The victim stated he was taken somewhere on Elm St. to MATTHEW's house. Investigators know based upon extensive surveillance, MATTHEW was utilizing a house located at 1343 Elm St., Cambridge, OH at this time. The victim stated that he was hit multiple times with MATTHEW's hands, and that he was stripped, advising that his pants were around his ankles, and that MATTHEW was checking him for a "wire." Your affiant believes that MATTHEW suspected the victim of cooperating with law enforcement. The victim advised that he owed MATTHEW $3,200.00, and indicated it was for "dope."

15. On or about February 13, 2019, at approx. 12:24 PM, surveillance units observed a dark colored Ford Mustang with a white colored racing stripe on the driver side door arrive at the rear of 1343 Elm St., Cambridge, Ohio. Two (2) males exited the vehicle. At approximately 4:49 PM, a male wearing a gray hoodie and gray stocking cap, carrying a gray backpack entered the Ford Mustang, bearing Ohio Tag: GNA-3710. The 2008 Mustang registers to Jennifer MATTHEW, the wife of Marlei MATTHEW, at 635 W. Main St, Newark, OH. Surveillance observed the 2008 Mustang depart from the residence at 1343 Elm St., Cambridge, OH.

16. From on or about February 15, 2019, to March 2, 2019, Detectives conducted surveillance at 1343 Elm St., Cambridge, OH on multiple occasions, observing the 2008 Mustang at this location. Detectives have identified this residence as a "Trap House," which is a location were narcotics are distributed. During the surveillance conducted, Detectives observed a high level of cars and foot traffic coming and going from the residence, which is a pattern of narcotics trafficking.

17. On or about June 30, 2019, surveillance determined that the residents of 1343 Elm St., Cambridge, OH were moving out of the residence.

18. On or about July 4, 2019, OSP Sgt. R. Menges met with a Confidential Informant (CI #2), and the CI had arranged for the purchase of Crack Cocaine and/or Heroin from MATTHEW. MATTHEW instructed the CI to a pickup location, and Investigators outfitted the CI with a recording device and pre-recorded Government funds. The CI was transported to the meet location, where MATTHEW picked up the CI in the 2008 Mustang. Investigators maintained surveillance on MATTHEW's vehicle. MATTHEW drove to an unrelated residence in Cambridge, OH. MATTHEW returned to the vehicle, and provided the CI with a baggie of suspected Heroin. This transaction was audio recorded, and the CI advised MATTHEW contacted an individual inside the house and instructed how much Heroin to be sold. The CI advised MATTHEW returned to the car and provided the Heroin to the CI, and the CI paid MATTHEW in pre-recorded funds. Sgt. Menges listened to the narcotics transaction made by the CI. The audio of the narcotics transaction was consistent with the description of the transaction as described by the CI. The suspected Heroin was submitted to the lab for testing, and confirmed to be 5.0 grams of Heroin, a schedule I controlled substance.

19. On or about July 8, 2019, OSP Sgt. R. Menges met with the CI, and the CI had arranged for the purchase of Heroin from MATTHEW. MATTHEW stated he was not available to meet, but instructed the CI to meet someone else on Woodlawn Ave. in Cambridge, OH, and that MATTHEW's associate would give the CI a ride to the location where the narcotics could be purchased. The CI was outfitted with a recorder, and provided with pre-recorded Government funds. The CI agreed and proceeded to the Woodlawn Ave. house where the CI met a Male/Black introduced to the CI as "E". The CI entered "E's" vehicle and was taken to 72489 Old Twenty One Road Kimbolton, OH. Investigators maintained surveillance on the vehicle. The CI entered the residence, and after a short time, exited the residence, and "E" drove the CI to a pre-determined meet location. The CI advised they entered the residence and observed an associate of MATTHEW, Chevaughn GOCUL, inside the residence. GOCUL retrieved suspected Heroin from a purple bag, "E" supplied the CI with an amount of suspected Heroin, and the CI paid "E" in pre-recorded funds. Sgt. Menges listened to the narcotics transaction made by the CI. The audio of the narcotics transaction was consistent with the description of the transaction as described by the CI. The suspected Heroin was submitted to the lab for testing, and confirmed to be 8.0 grams of Heroin, a schedule I controlled substance.

20. On or about July 12, 2019, OSP Sgt. R. Menges met with the CI, and the CI had arranged for the purchase of Heroin from MATTHEW. MATTHEW instructed the CI to a pickup location, and Investigators outfitted the CI with a recording device and pre-recorded Government funds. The CI was transported to the meet location, where MATTHEW picked up the CI in the 2008 Mustang. Investigators maintained surveillance on MATTHEW's vehicle. MATTHEW drove to 72489 Old Twenty One Road Kimbolton, OH, and the CI and MATTHEW entered the residence. After a short time, MATTHEW and the CI exit the residence, and MATTHEW drove the CI to a pre-determined meet location. This transaction was audio recorded, and the CI advised MATTHEW provided the CI with an amount of suspected Heroin, and the CI paid MATTHEW in pre-recorded funds. Sgt. Menges listened to the narcotics transaction between the CI and MATTHEW. The audio of the narcotics transaction was consistent with the description of the transaction as described by the CI. The suspected Heroin was similar in appearance as the previous purchases, and was submitted to the lab for testing.

21. On or about July 15, 2019, OSP Sgt. R. Menges met with the CI, and CI had arranged for the purchase of Heroin from MATTHEW. The transaction was set up between CI and MATTHEW via visual telephone calls (FaceTime). FaceTime communication is a standard communication practice used by MATTHEW and his associates. The CI was outfitted with a recording device and pre-recorded Government funds, driven to the area of Chestnut St., Cambridge, OH, and walked to a residence on Woodlawn Ave. The CI reached the area as described by MATTHEW, and the transaction was completed. This transaction was audio recorded, and the CI advised MATTHEW controlled the time of the buy, the location, and the amount of Heroin provided to the CI. The CI advised the deal occurred with an individual identified by investigators as Johnathan QUARLES. The CI paid QUARLES with pre-recorded funds, and received the suspected Heroin from QUARLES. MATTHEW was present via FaceTime for the transaction. The audio of the narcotics transaction was consistent with the description of the transaction as described by the CI. The suspected

Heroin was similar in appearance as the previous purchases, and was submitted to the lab for testing.

22. On or about this same date, OSP Sgt. R. Menges met with the CI, and the CI advised that MATTHEW contacted the CI about additional Heroin that was not available earlier in the day. The deal was arranged between the CI and MATTHEW to occur at 72489 Old Twenty-One Road, Kimbolton, OH. The CI was outfitted with a recording device and pre-recorded Government funds, and OSP Sgt. N. Goodnight drove the CI to the residence. The CI entered the residence, and after a short time, exited the residence and was picked up by Sgt. Goodnite. This transaction was audio recorded, and the CI advised the CI met with two (2) Unknown Male/Blacks, and that no names were exchanged. The CI advised that one of the individuals was younger, tall, thin, and from Akron, OH. The CI advised that MATTHEW instructed the deal via FaceTime, and the CI purchased an amount of Heroin with pre-recorded funds. The audio of the narcotics transaction was consistent with the description of the transaction as described by the CI. The suspected Heroin was similar in appearance as the previous purchases, and was submitted to the lab for testing.

23. On or about July 23, 2019, OSP Sgt. N. Goodnite met with the CI, and the CI had arranged for the purchase of Heroin from MATTHEW. MATTHEW instructed the CI to a pickup location, and Investigators outfitted the CI with a recording device and pre-recorded Government funds. The CI was transported to the meet location, where MATTHEW picked up the CI in 2008 Mustang. Investigators maintained surveillance on MATTHEW's vehicle. MATTHEW drove to 72489 Old Twenty One Road Kimbolton, OH, and the CI and MATTHEW entered the residence. After a short time, MATTHEW and the CI exit the residence, and MATTHEW drove the CI to a pre-determined meet location. This transaction was audio recorded, and the CI advised the deal took place inside the residence, and MATTHEW provided the CI with the suspected Heroin and the CI provided the pre-recorded funds directly to MATTHEW. The CI stated the suspected Heroin was kept in a closet to the left of the kitchen. The audio of the narcotics transaction was consistent with the description of the transaction as described by the CI. The suspected Heroin was similar in appearance as the previous purchases, and was submitted to the lab for testing.

24. On or about July 31, 2019, OSP Sgt. R. Menges met with the CI, and the CI had arranged for the purchase of Heroin from MATTHEW. MATTHEW instructed the CI to a pickup location, and Investigators outfitted the CI with a recording device and pre-recorded Government funds. The CI was transported to the meet location, where MATTHEW picked up the CI in the 2008 Mustang. Investigators maintained surveillance on MATTHEW's vehicle. MATTHEW drove to 72489 Old Twenty One Road Kimbolton, OH, and the CI and MATTHEW entered the residence. After a short time, MATTHEW and the CI exit the residence, and MATTHEW drove the CI to a pre-determined meet location. This transaction was audio recorded, and the CI advised inside the residence there was an older Male/White purchasing suspected Heroin from "E." The CI stated the CI's suspected Heroin was on a counter, and was already in a bag. The CI advised that MATTHEW weighed the suspected Heroin, the CI paid MATTHEW the pre-recorded Government funds, and MATTHEW provided the CI with the suspected Heroin. The audio of the narcotics transaction was consistent with the description of the transaction as described by the CI. The suspected

Heroin was field-tested by investigators, which tested positive for Heroin. The suspected Heroin was similar in appearance as the previous purchases, and was submitted to the lab for testing.

25. On or about August 14, 2019, OSP Sgt. R. Menges met with the CI, and the CI had arranged for the purchase of Heroin from MATTHEW. The CI contacted MATTHEW via FaceTime which was video and audio recorded. MATTHEW instructed the CI to a pickup location, and Investigators outfitted the CI with a recording device and pre-recorded Government funds. The CI was transported to the meet location, where MATTHEW picked up the CI in the 2008 Mustang. Investigators maintained surveillance on MATTHEW's vehicle. MATTHEW drove to 72489 Old Twenty One Road Kimbolton, OH, and the CI and MATTHEW entered the residence. After a short time, MATTHEW and the CI exit the residence, and MATTHEW drove the CI to a pre-determined meet location. This transaction was audio recorded, and the CI advised that the CI paid MATTHEW the pre-recorded Government funds and MATTHEW provided the CI with the suspected Heroin. The audio of the narcotics transaction was consistent with the description of the transaction as described by the CI. The suspected Heroin was field-tested by investigators, which tested positive for Heroin. The suspected Heroin was similar in appearance as the previous purchases, and was submitted to the lab for testing.

26. On or about August 22, 2019, ATF Agents and Task Force Officers (TFO's) conducted a Federal search warrant at 635 W. Main St., Newark, OH, the home residence of Marlei MATTHEW. Agents and TFO's secured MATTHEW and an older Juvenile, later identified as Chase Corathers, as well as two (2) dogs without incident. MATTHEW was secured in the Front Room, near the couch. Among the items recovered were a silver and black Apple iPhone and a black Alcatel flip-phone (TracFone Wireless, Inc.). The black TracFone was recovered on the couch, near MATTHEW. The Apple iPhone was recovered on the floor in the Front Room. The iPhone had missed calls and texts showing on the screen, including a missed FaceTime call from "Bc". A text message from "Bc" was present on the screen, which stated "Bro bury everything at the spot bro". Based on the fact that multiple Federal and State search warrants were being done in the Cambridge, OH area on associates of MATTHEW, and S/A Burns' knowledge and experience of conducting narcotics investigations, your affiant believes that this was a warning to dispose of evidence, to include narcotics.

27. The Apple iPhone and TracFone is currently in storage at the ATF – Columbus Field Office, 230 west Street, Suite #300, Columbus, OH. In my training and experience, I know that the Apple iPhone and TracFone have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state, as they were when the Apple iPhone and TracFone first came into the possession of the ATF.

## TECHNICAL TERMS

Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless Apple iPhone and TracFone used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a device that records still and moving images digitally. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store any digital data, such as word processing documents, even if the device is not designed to access such files. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes), and utilizing computer programs. Some PDA's also function as wireless communication devices, and are used to access the Internet and send and receive email. PDA's usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDA's run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDA's may also include global positioning system ("GPS") technology for determining the device.

    f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97 .178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

    g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

Based on my training, experience, and research, I know that the Apple iPhone and TracFone have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and a PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC DEVICES AND STORAGE

As described above and in Attachment B, this application seeks permission to search and seize things that the Apple iPhone and TracFone might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search

through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law-enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the ATF intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

## CONCLUSION

I submit that this affidavit supports probable cause for a warrant to search the Apple iPhone and TracFone and seize the items described in Attachment B.

Jason R. Burns
Special Agent, ATF


Sworn to and subscribed before me this ___9___ day of ___September___, 2019 in Columbus, Ohio.

Chelsey M. Vascura
U.S. MAGISTRATE JUDGE

## ATTACHMENT A

1. One black/silver Apple iPhone S, Model A1633 (Smart-phone), FCC ID: BCG-E2946A, ATF Property #: 000004, located inside ATF Columbus Field Office vault, FC-1 (hereinafter "Apple iPhone"), that relates to violations of the statutes listed on the warrant, and involve Marlei MATTHEW since November 2018.

2. One (1) black TracFone Wireless, Inc., (alcatel), Model A405DL (Flip-phone), FCC ID: 2ACCJN023, ATF Property #: 000007, located inside ATF Columbus Field Office vault, FC-1 (hereinafter "TracFone"), that relates to violations of the statutes listed on the warrant, and involve Marlei MATTHEW since November 2018.

## ATTACHMENT B

1. The items to be seized are:

    a. Identities of any other individual who are involved in trafficking in drugs;

    b. Lists of or evidence indicating anyone else and/or locations while trafficking in drugs;

    c. Items received and amounts of U.S. Currency that were obtained while trafficking in drugs;

    d. Any information related to trafficking in drugs;

    e. Any information recording Marlei MATTHEW's schedule or travel from November 2018 to the present; and

    f. All bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3. Records and things evidencing the use of the Internet Protocol address:

    a. Records of Internet Protocol addresses used;

    b. Records of lnternet activity, including firewall logs, caches, browser history and i-cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.